UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DAWN VERMETTE,

                          Plaintiff,            09-CV-6085

               v.                            **DECISION**
                                             **and ORDER**
VERIZON WIRELESS,

                          Defendants.
_____

## <u>INTRODUCTION</u>

Plaintiff, Dawn Vermette ("Plaintiff"), brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), 42 U.S.C. § 1981 and the New York State Human Rights Law, N.Y. Exec. Law. § 290 *et seq*. ("NYSHRL"). Compl. ¶1 (Docket #1). She alleges that the Defendant, Verizon Wireless ("Defendant" or "Verizon"), unlawfully retaliated against her for complaining of gender and racial[1] discrimination by demoting her, denying her a pay increases, subjecting her to performance criticism and increased supervision and placing her on performance improvement plans. She also alleges that these actions gave rise to an intolerable work environment, and she was constructively discharged as a result.

Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), contending that

---

[1]Plaintiff's Complaint alleges discrimination on the basis of her race and states that she is of Mexican ancestry, ethnicity and origin. Compl. at ¶4.

Plaintiff has not established a prima facie case of retaliation, nor shown that its legitimate, non-discriminatory reasons for its actions are a pretext for discrimination.   Plaintiff opposes Defendant's motion, arguing that there are material issues of fact which preclude summary judgment.

For the reasons set forth below, Defendant's Motion for Summary Judgement is granted in its entirety. Plaintiff's Complaint is hereby dismissed with prejudice.

## **BACKGROUND**

This Court has reviewed Defendant's Local Rule 56.1 Statement of Undisputed Material Facts ("Defendant's Statement"), Plaintiff's Responses to Defendant's Statement[2] ("Plaintiff's Responses") and the entire record in this case and finds that the following facts are not in dispute.   Plaintiff was employed by Verizon from November 6, 2000 through October 22, 2008.   As she progressed within the company between 2000 and 2006, Plaintiff was first employed as a customer service representative, later as a business

---

[2]This Court notes that Plaintiff has submitted "Responses to Defendant's Local Rule 56.1 Statement" and an additional "Local Rule 56.1(b) Counter Statement." (Docket #23.)  This Court has instructed Plaintiff's Counsel on the purpose and requirements of Local Rule 56 on numerous occasions.  And this Court will not consider Plaintiff's "Local Rule 56.1 Counter Statement" which does not comport to this rule and which only serves to confuse this Court's consideration of the instant motion.  See Ikewood v. Xerox, 2011 WL 147896 (W.D.N.Y. 2011);  Duckett v. Wal-Mart Stores, Inc., 2009 WL 995614 (W.D.N.Y. 2009); Szarzynski v. Roche Labaratories, Inc., 2010 WL 811445 (W.D.N.Y. 2010); Barkley v. Pennyan School Dist., 2009 WL 2762272 (W.D.N.Y. 2009); Kuchar v. Kenmore mercy Hosp., 2000 WL 210199 (W.D.N.Y. 2000); see also Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001) (discussing Local Rule 56.1 in the Southern and Eastern Districts of New York which is essentially the same as this District).

sales associate ("BSA") and also as a business sales representative ("BSR").  As a BSA, Plaintiff was responsible for providing phone and email support for Verizon's business customers.  As she moved into the BSR position in early 2006, she was expected to directly market and sell Verizon's services to its business customers and to achieve a monthly business sales quota as well as provide timely and accurate service to her accounts.

Plaintiff struggled to meet her monthly sales quota as a BSR and several of her supervisors were concerned that when they attempted to assist her in improving her skills, she "became defensive, offered excuses, and tried to shift blame to others." Defendant's Statement at ¶¶ 29, 47. Plaintiff continued to struggle throughout her tenure as a BSR, and continuously failed to meet sales quotas.

All Verizon employees who fail to meet sales quotas are subject to a "progressive discipline process" through which an employee is first issued a Verbal Warning, followed by a written Letter of Concern if his or her performance does not improve. Thereafter, an employee may be issued a Sales Performance Improvement Plan ("Sales PIP") followed by a Final Sales PIP, should he or she continue failing to meet sales quotas.  Following these four steps, an employee who continues to fail to meet Verizon's expectations may be evaluated for possible termination.

This progressive discipline process is administered by supervisors and Human Resources ("HR") representatives together. Should an employee improve his or her performance and begin to meet expectations at any point during this process, he or she may avoid termination or other potential consequences. However, when an employee is issued a Sales PIP, they are not permitted to apply for other positions within the company, in part because Verizon does not permit employees to "voluntarily demote" to avoid the four-step disciplinary process. Defendant's Statement at note 3.

In December 2006, Plaintiff's supervisor at the time, Mark Parmalee ("Parmalee"), issued Plaintiff a Verbal Warning for failing to meet her quota in the previous month. Sometime thereafter, Plaintiff discussed the implications of the Verbal Warning with an HR representative, Kathy Lippa ("Lippa"), and expressed her concern that other BSR's had not been issued warnings for failing to meet quotas. Lippa informed Plaintiff that she had time to improve her performance before she would experience any negative employment consequences and that she would research her concern that other BSR's were not similarly issued warnings.

Lippa and Luis Rivera, Associate Director of Human Resources ("Rivera") and Mark Harris, Director of Business Sales ("Harris"), jointly discussed Plaintiff's concerns and determined that all Verbal Warnings issued to employees for underperformance in November 2006 would be rescinded because the department as a whole

had performed poorly that month. However, the fact that Plaintiff's Verbal Warning was rescinded was never communicated to Parmalee, and the warning inadvertently remained in her file.

On March 1, 2007, Plaintiff's supervisor changed to Michael Gisondi ("Gisondi"). Later that month, as Plaintiff had continuously failed to meet sales quotas over the previous six month period, she was issued a written Letter of Concern. Then in April 2007 she was issued a Sales PIP, followed by a Final Sales PIP in June 2007.

Then, in late June 2007, Plaintiff complained to HR about several concerns related to her previous supervisor, Parmalee. She also inquired whether other employees were treated equally with respect to the progressive discipline process and employee development,[3] and she informed HR of her confusion about the progressive discipline process generally. She stated that she believed she should not have progressed to the end of the discipline process so quickly, because her initial Verbal Warning had been rescinded. She sought help with the progressive discipline process and also asked if she might be offered another position in the company.

She reiterated her concerns in an e-mail to Luis Rivera on July 20, 2007, in which she also stated that she believed that

---

[3]It appears that this concern was also related to her time working under Parmalee, because she testified that while she worked under Gisondi, everyone was treated equally. Vermette Dep. at page 88.

Parmalee only went on sales calls with men.  But, she also stated in her deposition that she knew that he went on several sales calls with another female BSR, Kathy Fitzgerald.  She then testified that he treated her differently than other employees by failing to help her develop as a BSR, and she believed it was partially because of her gender.  Vermette Dep. at 83-4.

She related in the e-mail to Rivera that she had a discussion with another manager at Verizon, Russ Preite, in which he told her that he was working with HR representative Lippa to find her a new position in the company.  She complained that he then stated that he believed that she was not able to adequately perform in the BSR position in part because it required her to work outside of regular business hours and, being a single mother, this was difficult for her.

She also stated in her e-mail to Rivera that she was told by another supervisor, Scott Hartman ("Hartman"), that although she was on a Final Sales PIP, she had been given some quota relief in the months leading up to her complaint to HR and she would be given new accounts to help her achieve her quota.  Hartman also advised her to discuss her inquiry regarding a transfer within the company with HR.

Lastly, the e-mail stated that she had overheard a comment at work that she "speak[s] ghetto." Def. Exhibit H.  Plaintiff now

attributes this comment to Parmalee, and states that he made the comment in early 2007 while she worked under his supervision[4].

Plaintiff stated that "[t]he outcome I would like to see as I am a valued tenured employee, is to be offered another position within Verizon Wireless....I am willing to review any alternative options that HR will be willing to offer me..." Def. Exhibit H.

HR representative Lippa then researched Plaintiff's complaint that other employees were not issued warnings or PIP's for failing to meet their sales quotas. Following her research, Lippa concluded that the progressive discipline process was followed on a "fair and equitable basis" for all employees. However, she noted that at that time Plaintiff should not have been on a Final Sales PIP, because the initial Verbal Warning issued to her in December 2006 had been rescinded, but inadvertently remained in her file. Accordingly, Plaintiff was then placed on a Sales PIP, the disciplinary step below the Final Sales PIP.

Lippa also spoke to Plaintiff's current supervisor, Gisondi, who related that Plaintiff's "performance was inconsistent and lacked follow-through. [He] outlined several steps that he had taken to assist and coach Ms. Vermette...[and] noted that when he

---

[4]Plaintiff also states that at some point in time, an employee said that she was the "cancer" of the group.  It is not clear from Plaintiff's Declaration or Plaintiff's Responses whether this occurred before or after her transfer or who made the comment. See Vermette Dec. at ¶46; Plaintiff's Responses at ¶61.  However, as explained below, this fact is not material to the Court's decision on the instant motion.

tried to coach [her], she became defensive, offered excuses, and tried to shift blame to others." Defendant's Statement at ¶29.

Lippa and Rivera met with Plaintiff on multiple occassions to discuss her concerns during June and July 2007. Then, On July 25th 2007, they met with her, reviewed her concerns and their findings and informed her that they "did not find any support for her allegations of inconsistent or unfair treatment." Rivera then informed her that she would be treated as if she were on a Sales PIP, he told her that they had spoken to Preite regarding his comment about her status as a single parent and he also assured her that her current supervisors, Gisondi and Hartman were "committed to her future success." Defendant's Statement at ¶34. Rivera asked Plaintiff what she was seeking, and she stated that she wanted her warnings rescinded and to be offered another job within the company. She testified that she wanted "not to be held accountable." Vermette Dep. at pp. 51-3.

Later, in September 2007, Plaintiff, still on a Sales PIP and unable to formally apply for other positions within the company, was offered an open position as a BSA for a government sales team by HR. The position came with a pay decrease, and Plaintiff would perform tasks similar to those that she performed in her previous BSA position, prior to 2006. She was also still subject to the progressive discipline process, but she would be granted a clean slate with no warnings or PIP's in her file for the new position.

Although she could have remained in the BSR position if she chose, and continued to work toward meeting her sales quotas, Plaintiff accepted the transfer and began working as a BSA effective October 1, 2007.  Plaintiff now states that she was "involuntarily demoted" to the BSA position and cites the decrease in pay as evidence of an "involuntary demotion."  She admits, however, that other employees have been issued PIP's, continued in their positions, and ultimately succeeded in coming out of the progressive discipline process and meeting their sales goals.

However, even after being transferred to the BSA position, Plaintiff's performance did not meet Verizon's expectations.  Her new supervisor, Mike Makuszak ("Makuszak") noted that she "lacked attention to detail, failed to follow-up with customers and internal contacts in a timely fashion, failed to process orders or complete other assigned tasks in a timely fashion, and lacked prioritization and management skills." Defendant's Statement at ¶45.  He also noted several specific areas where Plaintiff failed to meet his expectations, including numerous errors in order processing and authorization.

Makuszak relayed his concerns to Plaintiff, and she states that she told him that she felt overwhelmed.  She contends that he said he was "tired of babysitting [her] work." Plaintiff's Responses at ¶47.  He then issued a Verbal Warning to her in April 2008 and gave her suggestions on improving her performance, such as

paying close attention to detail, reviewing requests and making checklists of tasks and procedures.

Plaintiff claims that she was denied a pay raise in March 2008. However, she does not dispute that employees are not eligible for yearly pay increases if they are rated as "developing" for the previous year. Plaintiff was rated as "developing" for the 2007 year, and therefore, she was not eligible for a raise in March of 2008. Plaintiff was rated "developing" with the input of her supervisor for the end of 2007, Fred Hinrichson.[5]

On May 12, 2008, as Plaintiff's performance continued fall below expectations, Makuszak met with HR representatives Rivera and Lippa, to discuss the possibility of placing her on a PIP. They agreed to place her on a PIP, but Plaintiff left that same day on short-term disability leave before they could administer the PIP.

Plaintiff, represented by counsel, then filed a charge of discrimination with the Equal Employment Opportunity Commission on May 19, 2008, alleging retaliation based on the alleged "demotion" and denial of the March 2008 pay raise.

Plaintiff returned from disability leave in early September, 2008. Makuszak administered the PIP and Plaintiff states that he told her "clear up your attitude and everything will be okay."

_____

[5]It is unclear from the parties' submissions when Plaintiff's supervisor changed from Gisondi to Hinrichson, but Plaintiff has not claimed that either of these supervisors treated her differently than other employees or discriminated against her in any way.

Plaintiff's Responses at ¶54.  He advised Plaintiff that he would follow up with her in 30 days.

Plaintiff states that she believed Makuszak was "watching her" and she felt that she was "being marked" because of her prior complaints to HR. Plaintiff's Responses at ¶61.  She believed that he was unnecessarily monitoring her phone calls and e-mail usage.

In September 2008, Plaintiff amended her EEOC charge to include allegations that she was retaliated against based on the most recent PIP.  Plaintiff resigned from Verizon Wireless effective October 22, 2008.  She told HR representative Lippa that she had accepted a position with a competitor.  She now claims her working conditions were so intolerable that she was constructively discharged.

Plaintiff commenced the instant action on February 20, 2009, alleging retaliation and constructive discharge.  Specifically, she claims that after she complained of discrimination in early 2007 (she states that it was as early as March 2007), which was memorialized in an e-mail on July 20, 2007, she was demoted, denied a pay increase, subjected to unfair criticisms of her performance, placed on a PIP and overly monitored by her supervisor, Makuszak.

## DISCUSSION

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." See Fed.R.Civ.P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." See Scott v. Harris, 550 U.S. 372, 380 (2007). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation," Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998), but must affirmatively "set out specific facts showing a genuine issue for trial." See Fed.R.Civ.P. 56(e). To discharge this burden, "a plaintiff must come forward with evidence to allow a reasonable jury to find in his favor" on each of the elements of his prima facie case. See Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir.2001); see also D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998) ("non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of...events is not wholly fanciful.")).

In employment discrimination cases, the Court reviews a motion for summary judgment pursuant to the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S.

792 (1973).[6]   Under this framework, the plaintiff must first establish a prima facie case of discrimination.   The plaintiff's burden at this stage, however, is minimal.   See Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).   Thereafter, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action, which, if proffered, places the burden on the plaintiff to prove that discrimination was the real reason for the employment action.   See Wolf v. New York City Dept. of Educ., 421 Fed. Appx. 8, 10, 2011 WL 1571890 (2d Cir. 2011).

## A. Retaliation

To establish a prima facie case of retaliation, Plaintiff must present facts in support of the following elements: (1) she engaged in protected activity of which her employer was aware, (2) the employer took an adverse employment action against her, and (3) a causal connection exists between the protected activity and the adverse employment action. Paulino v. New York Printing Pressman's Union, Local Two, 301 Fed. Appx. 34, 37 (2d Cir. 2008).   In the retaliation context, an employment action is adverse if it is harmful such that it would have "dissuaded a reasonable employee in [her] position from complaining of unlawful discrimination."

---

[6]Plaintiff's claims under Title VII, 42 U.S.C. § 1981 and the New York State Human Rights Law are analyzed under the same standards. See Spiefel v. Schulmann, 604 F.3d 72 (2d Cir. 2010); see also Ruiz v. County of Rockland, 609 F.3d 486, 491 (2d Cir. 2010).

<u>Kessler v. Westchester Cnty. Dep't of Soc. Servs.</u>, 461 F.3d 199, 209 (2d Cir.2006).

Defendant argues that Plaintiff has failed to establish a prima facie case of retaliation. Specifically, it argues that Plaintiff's complaint to HR in 2007 did not constitute a protected activity and that she was not subjected to adverse employment actions following her discrimination charge to the EEOC in May 2008. They further argue that none of the employment actions taken were materially adverse and Plaintiff has not produced evidence of any causal connection between the actions that were taken and her alleged protected activity. Lastly, they argue that Plaintiff has not rebutted their legitimate, non-discriminatory reasons for their actions – her poor performance and inability to meet sales quotas, and that she voluntarily requested and accepted the transfer to the BSA position and could have remained in the BSR position.

Even assuming that Plaintiff has produced sufficient evidence to establish a prima facie claim of retaliation, and drawing all reasonable inferences in her favor, this Court finds that Plaintiff has not present evidence from which a reasonable jury could find that Defendant's proffered reasons for its actions were pretextual, and its real motive was discrimination.

<u>1. Involuntary Demotion</u>

Plaintiff states that she suffered an "involuntary demotion" because her pay was reduced when she accepted the transfer to the

BSA position.  She argues that she had no choice but to accept the position because she could not afford to lose her job.  Plaintiff, however, has not come forward with any evidence to support the contention that she "had no choice" but to accept the transfer or suffer termination or some other negative employment consequence. She admits that being placed on a Sales PIP is not ultimately detrimental to a person's success in a given position at Verizon, rather, it is meant to assist that person in achieving their sales quotas by giving them a plan of action to accomplish their goals. While it is arguably disciplinary in action, it does not carry with it consequences other than the knowledge that if you do not improve your performance, you may be placed on a Final PIP.  Only after an employee is placed on a Final PIP, and ultimately does not improve his or her performance, is she potentially subject to a review for termination.  Plaintiff, however, was only on a Sales PIP when she was offered a transfer to the BSA position.

Further, Plaintiff does not dispute the fact that she requested the ability to seek out other positions in the company as well a transfer to any open position on multiple occassions.  In her July 2007 e-mail to HR representative Rivera, she specifically stated that she was "willing to review any alternative options that HR will be willing to offer" and she referred to a conversation she had with Scott Hartman regarding the same. Def. Exhibit H.  The only evidence she offers that the BSA transfer was involuntary is

that her salary was decreased as a result of the transfer.  This Court does not find that this is sufficient to overcome Defendant's legitimate, non-discriminatory reason for offering Plaintiff the transfer and allowing her to move into the BSA position with a clean slate.  It is worth noting that allowing Plaintiff to seek a transfer was against company policy, as the company does not typically allow employees to escape the four-step disciplinary process by "voluntarily demoting" themselves. Plaintiff does not dispute that she requested another position in the company while on a Sales PIP and Verizon provided her an accommodation by lifting company policy, permitting her to transfer and start her new position with a clean slate in the four-step disciplinary process. The facts, even viewed in the light most favorable to the Plaintiff, do not support Plaintiff's contention that the real reason for the transfer was discrimination. See e.g.  Bryan v. Lucent Technologies Inc., 307 F.Supp.2d 726 (D. Md. 2004)(plaintiff who was underperforming in her previous position and voluntarily sought out and accepted a transfer could not establish a cause of action for retaliatory discrimination).

Plaintiff makes much of the fact that Russ Priete made a comment regarding her status as a single parent and she also states that she learned that another employee had referred to her as the "cancer" in the group at some point in time.  However, it does not appear that these statements are related to Plaintiff's gender or

race such that they could support her claim that Defendant's reason
for allowing her to transfer is a pretext for discrimination and
that discrimination was the real reason for it's actions. See
Oncale v. Sundowner Offshore Services, Inc., 532 U.S. 75 (1998)
("Title VII does not prohibit all verbal or physical harassment in
the workplace; it is directed only at 'discriminat [ion] ...
because of ... [an individual's race, color, religion, sex, or
national origin].'"); see also Faragher v. City of Boca Raton, 524
U.S. 775 (1998) (noting that Title VII is not a "general civility
code" and Courts must apply standards to "filter out complaints
attacking the ordinary tribulations of the workplace, such as the
sporadic use of abusive language, gender-related jokes, and
occasional teasing.").

Accordingly, this Court finds that Defendant has proffered a
legitimate, non-discriminatory reason for offering Plaintiff a
transfer.  Plaintiff has not presented evidence from which a
reasonable jury could conclude that this reason was a pretext for
discrimination.

2. Denial of the March 2008 Pay Raise

Plaintiff also contends that she was denied a pay raise in
March 2008.  However, Plaintiff does not dispute that she failed to
meet her sales quota for several months in 2007 and was ultimately
rated as "developing" as a result.  She also does not dispute that
employees rated as "developing" are not eligible for pay increases.

The only evidence Plaintiff offers to support her claim based on the denial of a pay increase is her testimony that her supervisor, Mark Parmalee, failed to properly "develop" her by going with her on sales calls, that he did not like her and that he said that she "speak[s] ghetto." However, Plaintiff stopped reporting to Parmalee in March of 2007, prior to her complaints to HR, and therefore his conduct cannot reasonably support a claim for retaliation. See Dansler-Hill v. Rochester Institute of Technology, 764 F.Supp.2d 577, 582 (W.D.N.Y. 2011)("The crux of any retaliation claim is a cause-and-effect relationship whereby protected activity precedes, and gives rise to, an adverse employment action. It is axiomatic that no such relationship can be found to exist where the alleged adverse employment action began and ended prior to the commencement of any protected activity.").

Her performance also continued to fall below expectations under supervisors Gisondi and Hinrichson, to whom she reported for the remainder of 2007. Plaintiff did not complain of unequal treatment or any discriminatory conduct on the part of Gisondi or Hinrichson, and she specifically testified that Gisondi treated everyone equally. Plaintiff's "developing" rating was issued with the input of Hinrichson, and there is no evidence that Parmalee contributed to the "developing" rating. Plaintiff also has not disputed that the rating itself was an accurate depiction of her performance - as she failed to make sales quotas for several months

in the year and Gisondi noted that her "performance was inconsistent and lacked follow-through. [He] outlined several steps that he had taken to assist and coach [her]...[and] noted that when he tried to coach [her], she became defensive, offered excuses, and tried to shift blame to others." Defendant's Statement at ¶29.

Therefore, this Court finds that Defendant has proffered a legitimate, non-discriminatory reasoning for denying Plaintiff a pay increase in March 2008. Plaintiff has not presented evidence from which a reasonable jury could conclude that Defendant's reason was a pretext for discrimination and that discrimination was the real reason she was denied the pay increase.

### 3. Work Criticisms and the Progressive Discipline Process

Plaintiff last argues that she suffered retaliation based on the fact that she was subjected to work criticism, increased monitoring and placed on PIP's. Plaintiff admits, however, that she continuously failed to meet her sales quotas while she was a BSR and she further admits that when she was transferred to the BSA position, her work performance continued to fall below expectations. Plaintiff presents no evidence that the reason she was subjected to criticism, increased monitoring and the progressive discipline process (*i.e.* her continuously poor performance), was a pretext for discrimination.

The only evidence of any arguably gender or race-based discriminatory conduct occurred while Plaintiff was under the

supervision of Mark Parmalee, prior to her complaints to HR. Parmalee's remarks about Plaintiff's speech and her allegations that he failed to develop her because of her gender, are insufficient to show that her work was criticized, she was monitored, or that she was placed on PIP's for discriminatory reasons <u>after</u> she made her complaints to HR and after she was placed under other supervisors.   Additionally, the only disciplinary action taken while Plaintiff was under Parmalee's supervision, a Verbal Warning, was later rescinded, following her complaints to HR, which does not support her claim of retaliation. As a BSR, she was not officially disciplined again until she came under the supervision of Gisondi and Hinrichson, with whom she has no complaints.

When she was transferred to the BSA position, Makuszak continued to have similar criticisms of her performance.   Plaintiff has not provided any evidence to support her contention that Makuszak's concerns about her performance were unwarranted or discriminatory in nature.   She merely states that she told Makuszak that she was overwhelmed and he responded that he was tired of "babysitting" her work.   Plaintiff has not submitted evidence from which a reasonable jury could conclude that she was criticized, monitored, or subjected to the progressive disciplinary progress for discriminatory reasons, or for any reason other than her admittedly poor work performance.

Simply put, Plaintiff's allegations related to Parmalee's discriminatory conduct, which occurred prior to her complaints to HR and the EEOC and prior to any allegedly adverse action taking place cannot reasonably support her contention that the real reason that she was subjected to discipline was not her poor performance, but discrimination.  This is particularly true because Plaintiff has not presented any other evidence of discriminatory conduct by any other supervisor, and she was no longer under Parmalee's supervision when she made complaints to HR.

### B. Constructive Discharge

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Chertkova v. Connecticut General Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996).  The evidence proffered by the Plaintiff is insufficient for a reasonable jury to conclude that her working conditions were so intolerable that a reasonable person would have felt compelled to resign.  While Plaintiff felt "overwhelmed" by the work and failed to meet Defendant's performance expectations for 2007 and 2008, and was therefore subject to warnings and performance improvement plans and did not qualify for a pay raise,

these conditions are not so intolerable that a reasonable person would have felt compelled to resign. Particularly because Plaintiff admits that her performance was not satisfactory during the relevant period and it was within her control to improve her performance. See Petrosino v. Bell Atlantic, 385 F.3d 210, 230 (2d Cir. 2004) ("[W]here an employee has within her power the means to eliminate the added condition that purportedly renders her employment intolerable and fails to pursue that option, she cannot demonstrate that she was compelled to resign."). It is noteworthy that Plaintiff states that just prior to her departure, she met with Makuszak regarding the PIP, and he told her that if she improved, "everything will be okay." Further, Plaintiff acknowledges that being placed on a PIP, even a Final PIP, does not prevent an employee from improving their performance and eventually having a successful career with Verizon. Cf. Chertkova, 92 F.3d at 89-90 (finding a material issue of fact where plaintiff experienced an "onslaught of unfounded criticism coupled with the threat of immediate termination")(emphasis added).

Accordingly, this Court finds that Plaintiff has not presented sufficient evidence for a reasonable jury to find that she was constructively discharged.

## CONCLUSION

For the reasons set forth above, this Court grants Defendant's Motion for Summary Judgment in its entirety.  Plaintiff's Complaint is hereby dismissed with prejudice.


**ALL OF THE ABOVE IS SO ORDERED.**


                                    s/ Michael A. Telesca
                                  MICHAEL A. TELESCA
                               United States District Judge

Dated:     Rochester, New York
           September 6, 2011